**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **K.S. B/N/F** | § | |
| **NEONDA NECOLE THOMAS** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **C.A. 4:13-cv-0188-RAS-DDB** |
| | § | |
| **NORTHWEST INDEPENDENT** | § | |
| **SCHOOL DISTRICT** | § | |
| *Defendant* | § | |

<u>**PLAINTIFFS RESPONSE TO NORTHWEST INDEPENDENT SCHOOL DISTRICT'S
MOTION FOR SUMMARY JUDGMENT**</u>

**NOW COMES** K.S. and Neonda Necole Thomas as next friend of K.S.1 (collectively termed Plaintiffs herein), by and through their attorney Martin J. Cirkiel from the law firm of Cirkiel & Associates, P.C., and bring this their *Response To Northwest Independent School District's* ("Northwest ISD") *Motion For Summary Judgment* (hereinafter simply referred to as "the *Motion*" or DE# 37 )2 and in support thereof, Plaintiffs respectfully show the following:

**I.  <u>BRIEF RESPONSE</u>**

1.    The School District provides evidence that they have developed policies and procedures to address the verbal harassment and physical assault of a student (like K.S.), when such verbal harassment and physical assaults are based upon, and among other things, gender and gender stereotypes (DE# 37-2). They proudly note that staff has participated in a program developed by a federal agency, called *Bullying Among Children & Youth*, which is published by the

---

1. Initials are used to protect the confidentiality of the minor student and others similarly situated.

2. Where Plaintiffs cite to the School District's *Motion For Summary Judgment* they will use DE# 37 with the related page number.  Where Plaintiffs cite to their exhibits they will use, for instance DE# 37-2, with the related page number, rather than the Exhibit number.

*Health Resources and Services Agency*.3   The program is noteworthy in a number of manners and particulars.  It defines the problem to include hitting, shoving, taunting, racial slurs and obscene gestures (DE#37-12, p. 9/27).  It directs the teachers to be particularly observant in hot spots, like the playground, lunchroom, halls and the bathroom (DE#37-12, p. 13/27).  Further, that while the harassment is generally more common at school, officials should be concerned about harassment when the student is going to and from school, as well (DE#37-12, p. 13/27).  Importantly, that a tell-tale sign that a student is being victimized is when the student has high absenteeism and reports of depression (DE#37-12, p. 16/27) with physical manifestations of the depression like headaches and abdominal problems (DE#37-12, p. 17/27). Another "red flag" is that a child who is victimized is often quick-tempered and will fight back when provoked and will even try to harass weaker and smaller children (DE#37-12, p. 18/27).  And that unchecked harassment will often lead to suicide attempts (DE#37-12, p. 21/27).  The federal program provides school districts with information as to what programs work and which do not. Not surprisingly, the least effective is punishment (student exclusion), peer mediation and simple short-term solutions (DE#37-12, p. 7, 25-26/27) and last, that teachers overestimate their own effectiveness in addressing the issue (DE#37-12, p. 23/27).

2.      The following review of the record will reflect that this Defendant School District apparently learned little from the program that each attended, as almost each and every indicator in the training pertained to K.S.  And just as K.S and his mother report, little was done to apply that

---

3.  It is the primary Federal agency for improving access to health care by strengthening the health care workforce, building healthy communities and achieving health equity. HRSA's programs provide health care to people who are geographically isolated, economically or medically vulnerable.

information to his situation.  For this reason, K.S. has alleged the various acts and omissions of the School District, as more fully described below, satisfy the elements for a claim predicated Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U.S.C. § 1681 *et seq; see also* <u>Davis v. Monroe County Board of Education</u>, 526 U.S. 629 (1999).

3.    The School District has filed their *Motion For Summary Judgment* arguing that K.S. cannot meet his burden, on the elements of a Title IX claim.  K.S. files his *Response* that will provide sufficient summary evidence that he can meet his burden.  As there are contested issues of material facts, such that a reasonable jury could determine that the Northwest Independent School District violated K.S.' rights under Title IX, their *Motion* should be denied and this case be permitted to proceed to trial.

## II.  <u>TABLE OF CONTENTS</u>

I.      BRIEF RESPONSE . ................................................................................... 1

II.     TABLE OF CONTENTS ............................................................................. 4

III.    ISSUES TO BE DECIDED . ......................................................................... 5

IV.     STANDARD OF REVIEW . ......................................................................... 6

IV.     EVIDENCE CONSIDERED . ....................................................................... 9

V.      RELEVANT FACTUAL AND PROCEDURAL RESUME ........................... 9

VI.     OUT-OF-POCKET EXPENSES ...................................................................22

VII.    ARGUMENT AND AUTHORITIES ............................................................ 23

VIII.   CONCLUSION AND PRAYER . ................................................................. 33

IX.     CERTIFICATE OF SERVICE . ................................................................... 34

X.      APPENDIX ..................................................................................................

        A.      Protecting Students From Harassment And Hate Crimes, U.S. Department Of
                Education, Office For Civil Rights ("OCR") (1999)  ................................................

        B.      Memorandum Re: Harassment Based Upon Disability, U.S. Department Of
                Education, Office For Civil Rights (2000) .............................................................

        C.      Title IX Revised Standards (2001) ........................................................

        D.      Bullying And Teasing Of Students With Disabilities, National Center On Secondary
                Education And Transition, Issue Brief (2003) .........................................................

        E.      Bullying and Peer Victimization (2007) ...................................................................

        F.      Bullying In Schools, U.S. Department Of Justice (2009) .....................................

        G.      Dear Colleague Letter U.S. Department Of Education, OCR (2010)  .....................

### III. EVIDENCE CONSIDERED

4.      Plaintiffs incorporates by reference the factual contentions noted in the *Plaintiff's Original Complaint* that have not been specifically *denied* by Defendant; with such facts more fully addressed and supported with proper citation below.

5.      In addition, they rely upon documents currently in the Court's file as part of the public record, including any produced in an underlying "due process hearing" and provided by the TEA.  Mahone v. Addicks Util. Dist. Of Harris County, 836 F.2d 921, 935 (5th Cir. 1988).

6.      Further, they relies upon all the statements and arguments provided by the Defendant School District, in all their own pleadings filed in this cause, which evidence is deemed admitted and is self-authenticated, especially their own:

        a.      *Motion For Summary Judgment*, with attached exhibits; and

        b.      Response To Plaintiffs *Request For Admissions;*

        *See also*  Fed. R. Civ. P. 26; Fed. R. Civ. E. 201, 801(d)(2), 803(6) and (18).

7.      Plaintiffs also provide the relevant excerpts and sections of the following:4

        a.      The Declaration of K.S. (Exh. A);

        b.      The deposition testimony of K.S. (Exh. B);

        c.      The Declaration of Neonda Thomas (Exh. C)

        d.      The deposition testimony of Neonda Thomas (Exh. D);

        e.      Select *Exhibits*, attached to the deposition testimony of Neonda Thomas (Exh. E);

        f.      The deposition testimony of Gwen McCormick (Exh. F);

        g.      The Declaration (Exh. G) with *Expert Report* of Louis Geigerman (Exh. G-1);

---

4.  Where Plaintiffs cite to an *Exhibit* they will use the letter, with a related page number.

       h.      Portion of the Texas Education Agency Record (Exh. H) and

8.      Declaration of Martin J. Cirkiel (Exh. I).

9.      With all the above paragraphs in mind, Plaintiff's proceed accordingly.

## IV.  <u>STANDARD OF REVIEW</u>

10.      In regard to evidence of the non-movant, it is to be believed and all reasonable inferences inure to the favor of his favor, <u>Willis v. Roche Biomedical Labs., Inc.</u>, 61 F3d 313, 315 (5th Cir. 1995); *see also* <u>Matsushita Elec. Indus. V. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  Importantly, the Court should refrain from resolving factual disputes by weighing conflicting evidence, <u>Toney v. Kawasaki Heavy Indus., Ltd.</u>, 763 F. Supp 1356 (S.D. Miss. 1991), *aff'd* 975 F2d 162 (5th Cir. 1992) or assess its probative value or otherwise decide factual issues. <u>Byrd v. Roadway Exp., Inc.</u>, 687 F2d 85, 87 (5th Cir. 1982); <u>Tolan v. Cotton</u>, 2014 WL 1757856; 134 S. Ct. 1861 (2014) [Courts should adhere to "the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party."].

11.      In short, summary judgment is not appropriate unless, after viewing the evidence in the light most favorable to the nonmoving party, no reasonable fact-finder or jury could return a verdict for that party. *See, e.g.,* <u>Rubinstein v. Adm'rs of the Tulane Educ. Fund</u>, 218 F.3d 392, 399 (5th Cir. 2000).

12.      The central issue in regard to a dispositive motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-252 (1986).  A review of the facts relative to the operative legal standards in this cause will show that such evidence is not so one-sided in favor of the Defendant School District and

that their *Motion For Summary Judgement* should be denied accordingly.

13.   Moreover, in their *Motion*, the Defendant relies upon carefully crafted affidavits and excerpted documents from their own files. In essence, it is their own story, in their own words that they ask this Court to believe.  At the summary judgment stage, the Court should view these assertions with a very high degree of caution.  In <u>International Shortstop, Inc. v. Rally's Inc.</u>, 939 F.2d 1257, 1265-1266 (5th Cir. 1991), the Fifth Circuit shed light on a court's duty when reviewing the self-serving factual statements of a party involved in the critical facts of the case, as is the situation in this case.  Specifically that a "cold read" of a motion for summary judgment is generally no substitute for a trial, because it "cannot unmask the veracity of a witness clad in a costume of deception; it cannot unveil that a seemingly well-groomed witness is coming apart at the seams or that he fidgets when answering critical questions, his eyes shift from the floor to the ceiling and he manifests all other indicia attributed to perjurers."

14.   A denial of said *Motion* is also fully in accord with strong public policy sentiments that summary judgment is a drastic remedy, <u>Smoot v. Chicago, R. I. & P., Co.</u>, 378 F2d 879 (10th Cir. 1967) and should be used sparingly, <u>City Nat'l Bank of Fort Smith, Ark. v. Vanderboom</u>, 422 F2d 221 (8th Cir. 1970).  This public policy is even more appropriate when dealing with statutes that address civil rights of the litigants and are remedial in nature, like Section 504 and the ADA, in this cause.

Moreover:

"Statutes of rehabilitation should be construed in a liberal and humanitarian mode thus effectuating successfully the legislature's objective intentions.  Such construction of rehabilitative statutes promote the public interest, public welfare, public state policy and the police powers.  Such salutary constructions properly disregard technical and meaningless distinctions but give the enactment the most

comprehensive application of which the enactments are susceptible without violence to the language therein.  <u>Deep East Texas Regional Mental Health & Mental Retardation Services v. Kinnear</u>, 550 S.W.2d 550, 563 (Tex. App. – Beaumont, 1994);" *see also* <u>Tchereepnin v. Knight</u>, 389 U.S. 332, 336 (1967) [remedial legislation should be construed broadly to effectuate its purpose].

15.    In recognizing the propensity to treat discrimination cases with a higher burden on a Appellant, the Supreme Court has noted in Roger Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141; 120 S. Ct. 2097, 2105; 147 L.Ed 2d 105, 116 (2000), that the exercise of looking to the facts and the reasonable inferences from those facts is particularly crucial in cases regarding discrimination "as the question facing triers of fact in discrimination cases is both sensitive and difficult."

16.    Further, *see* Reeves at p. 148, lower Courts should not treat discrimination cases with more scrutiny than other cases dealing with ultimate questions of fact, citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 524; 125 L. Ed. 2d 407; 113 S. Ct. 2742 (1993).

17.    Last, and even if this Court believes that Defendant has satisfied the elements as contemplated by Fed. R. Civ. P. 56, Plaintiffs note that, "Even in cases where the movant has technically discharged his burden, the trial court in the exercise of a sound discretion may decline to grant summary judgment." <u>National Screen Service Corp. v. Poster Exchange, Inc.</u>, 305 F.2d 647, 651 (5th Cir. 1962). Such an outcome is also appropriate where important public policy decisions are involved. <u>Marcus v. St. Paul Fire & Marine Ins. Co.</u>, 651 F2d 379 (5th Cir. 1981); <u>Anderson v. Liberty Lobby, Inc.</u> at 255-256, as they surely are in this case.

18.    It is with this standard in mind, and their elements noted herein, that Plaintiff's proceed and provide significant summary judgment evidence to defeat the School District *Motion*.

### VII.  COMMENT ON SCHOOL DISTRICT'S UNCONTROVERTED FACTS

19.     In their *Motion For Summary Judgment* the School District provides a section named *Uncontroverted Facts,* with supporting evidence.  For the most part K.S. does not disagree with their rendition of the facts, because first, it is *their* rendition of the facts and second, and most importantly, this case is more about what the School District failed to do, which of course are things that won't be in their evidence.

### VIII.  STATEMENT OF FACTS

A.     SCHOOL DISTRICTS ARE REQUIRED TO ADDRESS HARASSMENT BASED UPON GENDER AND GENDER STEREOTYPES

20.     In January of 1999, the U.S. Department of Education ("DOE"), Office of Civil Rights ("OCR") produced a document, *Protecting Students From Harassment And Hate Crime* (Appendix A) which essentially provided for schools a *Checklist* of items, that if they followed, would help to develop a culture that make the schools safer for all students and help to <u>prevent</u> harassment and sexual assault (p. 5-7).  In a document of over 157 pages, it did address harassment based upon race (p. 16), on disability (p. 18) and sexual harassment (p. 17).5   It noted that harassment if ignored, it could jeopardize a student's academic achievement, undermine their physical and emotional well-being and provoke retaliation (p. 1).  It listed examples of effective actions including, most importantly, timely investigations, appropriate use of punishment, remedial actions like increasing adult supervision of "hot

---

5.  The uncontroverted evidence reflects that K.S. was the object of racial epithets.  It also reflects he was seen to be a student with a disability by school personnel.  K.S. waives any claims related to Title VI, Title VII of the Civil Rights Acts, or Section 1983, as to race and likewise waives any claims related to Section 504 of the Rehabilitation Act of 1973 or the Americans With Disabilities Act, related to disability.  K.S. does believe the School District failed to correctly consider race, and to a lesser extent disability, during their investigation that K.S. was harassed and assaulted because of gender and gender stereotypes, but does believe the District was "deliberately indifferent" to him because of race or disability.

spots," close monitoring of the victim, use of informal conflict resolution, providing emotional and psychological support for the victim and greater teaching across the school community (p. 7), including and especially staff (p. 8-9).

21.    In 2000 the OCR and the Office of Special Education ("OSERS") sent out it's first *Memorandum* regarding harassment based upon disability.   It was sent to school boards and districts throughout the country. It discussed, among other things the profound effects of harassment on a student, the laws that apply and how such harassment, unrequited, effects a students equal opportunity under those laws to receive an education. (Appendix B).

22.    In 2003 the OCR contracted with the *National Center On Secondary And Transition* (Appendix C), to study the effect of bullying on students with disabilities.  The report noted at the onset that many adults were ambivalent to the issue, believing it served a function in society for "rites of passage."   Importantly, that students who were harassed often retaliated (p. 1). Further, students consistently ranked "teasing" as the primary mode of verbal harassment, which was found to be even more psychologically damaging than infrequent physical harassment. They *Center* noted that the ability to deal with harassment was related to the student's social and communication skills (p. 2). It suggested that the school district survey the student body, hold a school conference on the topic, provide better supervision and seek parental support.  It suggested that students help develop rules, that victims and perpetrators receive counseling and a monitoring program be used to assure practices are working to prevent re-victimization of students who are harassed (p.4).   Specifically It reinforces the practices noted in the DOJ memo of 1999 and the OCR letter of 2000.

23.    In 2009, the Department of Justice ("DOJ") issued a bulletin to address harassment in schools (Appendix D). Now about a decade after the 1999 DOE Directive noted above, this

writing developed an expanded list of responses to harassment in schools that were successful, as compared to those that were less so (p. 25-28).  It acknowledged as most successful, a "whole-school approach" encouraging students to report bullying and harassment.  It also noted the importance of a comprehensive tracking system, that especially tracked victims (p. 17, 20).  It noted the least effective intervention was a "zero-tolerance policy," that relied upon punitive measures, without more effective interventions and instructional strategies.  It also commented that mediation or other conflict resolution was generally not indicated where the participants were of unequal power or status (p. 23-24).  Most importantly, it noted a victim as "chronic" even if only several times per week and that anti-harassment programs should have special considerations for chronic victims (p. 12, 13).

24.     These federal guidelines and directives noted above, over the course of time became integrated into, and became part of Texas law as well.  First, there were increased penalties in the Juvenile Justice system for students who assaulted, bullied and harassed other students (*see* Texas Education Code §37.001).

B.      ABOUT THE NORTHWEST INDEPENDENT SCHOOL DISTRICT

25.     The School Board has developed policies, procedures and practices to reflect these standards in general, and specifically when the bullying and harassment was based upon race, nationality, disability or gender and gender stereotypes (DE# 37-11, p. 2-23).

26.     This School Board adopted and incorporated into their practices a program developed by the *United States Health Resources and Services Agency.*  It was called *Bullying Among Children & Youth.*  It set forth definitions for bullying and harassment to include hitting, shoving, taunting, racial slurs and obscene gestures (DE#37-12, p. 9/27).  That teachers be particularly observant in hot spots, like the playground, lunchroom, halls and the bathroom

(DE#37-12, p. 13/27) and even outside the school, as well (DE#37-12, p. 13/27). Importantly, that high absenteeism is an indicator that something is wrong, especially when linked to depression (DE#37-12, p. 16/27), and headaches and abdominal problems (DE#37-12, p. 17/27). Teachers are asked to be particularly cognizant of the student who complains that are being harassed and assaulted and who fights back when provoked. And further, that such a student will often harass weaker and smaller children (DE#37-12, p. 18/27). The training let staff know the obvious, that unchecked harassment will lead to suicidal ideation and attempts (DE#37-12, p. 21/27).

27.     It was provided to the entire campus and all district employees were required to be cognizant of its requirements, especially administrative staff like Conklin and McCormick (Exh. F, p. 27, 1-25; 67, l. 1-18). Staff were taught to look for the elements and behaviors related to bullying and harassment and not only to what words were used by a complainant (Exh. F, p. 33, l. 14-18). As noted in the training discussed above, staff were also to look for students were alleging they were being bullied and harassed but also had their own behavior problems in responding (Exh. F, p. 41, l. 10-20). McCormick affirmed that a perceived lack of gender norms, or a non-typical body type, like being fat, could rise to the level of a Title IX concern (Exh. F, 42, p. 1-8)

28.     This federal program also provides school districts with information as to what programs work and which do not. Not surprisingly, the least effective is punishment (student exclusion), peer mediation and simple short-term solutions (DE#37-12, p. 7, 25-26/27). As a final consideration, the report tells teachers that the statistics show that they often overestimate their own effectiveness in addressing the issue (DE#37-12, p. 23/27).

C.       BRIEF REVIEW AND GENERAL EXPERIENCE OF K.S AT THE NORTHWEST ISD.

29.      K.S. is now just about sixteen (16) years-old, having been born on September 5, 1999.  He

is now in the 11th grade at the Evangel Christian Academy in Shreveport, La. (Exh. B, p. 8,

l. 16-25; p. 9, l. 2-6).

30.      He is a male of African-American descent. K.S. attended the Tidwell Middle School at the

Northwest ISD in the fall of 2010 and withdrew in early 2011 (Exh. B at p. 9, l. 10-11).

Prior to the time he was the Tidwell School he never had any problems with attendance,

though he did while there (Exh. B, p. 15, l. 10-14).

31.      When asked to express his experience at the school he reported it as "horrible." He had no

friends and experienced a lot of teasing.  In addition, that school officials were of no help

at all (Exh. B, p. 20, l. 21-25) which caused him to experience depression and suicide

attempts (taking five pills of Melatonin, Exh. B, p. 25, l. 9) while in the Dallas area and

when he first went to Louisiana (Exh. B, p. 24, l. 9-13).

32.      He remembers it as being the worst place he has ever been in his life (Exh. B, p. 94, l. 1-94)

as he was harassed every day he was there (Exh. B, p. 116, l. 17-21) because he had breasts

like a girl, was pigeon-toed and flat footed and walked funny, and was called gay because

of all this (Exh. B, p. 126, l. 1-25).

33.      At his deposition K.S. was asked if there was any specific events which caused the suicide

attempt.  He answered in the affirmative that there was incident in PE when a number of

students were touching his breast (Exh. B, p. 26, l. 21-25; p. 130, l. 10-11). He was in the

locker room getting dressed and kids were making fun of him and were touching his chest.

K.S. remembers that he left the area, and reported it to one of the coaches.  The other boys

told the Coach that K.S. was talking about them, and he believed them, so the Coach

punished K.S. in front of everyone and made him do push-ups (Exh. B, p. 26, l. 5-25; 27, l. 1-2). When K.S. attempted to tell the Coach his side of the story, the Coach told him "don't run home crying to your momma, and tell her people [are] bullying you. (Exh. B, p. 27, l. 16-21). The Coach was later admonished for his un-professionalism (Exh. F, p. 176, l. 9-21).

34. K.S. told Vice-Principal McCormick (Exh. F, p. 8, l. 9-13) who stated she would investigate the complaint. K.S. reports nothing changed, as he was still harassed, even after he told her (Exh. B, p. 26, l. 1-25), which all led to suicide attempt and hospitalization, first in Texas and later in Louisiana (Exh. D, 58, l. 9-14)

35. When asked if there was anything else that drove K.S. towards suicide he reported that kids would call him names and not let him sit down on the bus. He was also harassed a number of times in the cafeteria (Exh. B, p. 89, l. 16-25) when at lunch some of the students would move his stuff around (Exh. B, p. 92, l. 13-14), would throw food at him, make fat jokes (Exh. B, p. 90, l. 14-16), and like the above noted incident, no one helped him (Exh. B, p. 31, l. 2-12). In fact, when he told McCormick about his problems in the cafeteria she had K.S. moved out of the cafeteria and he had to eat in a classroom alone. While the harassment in the cafeteria stopped, not surprisingly he became even more depressed because he now had to eat alone and became even more isolated (Exh. B, p. 92, l. 18-25),

36. K.S. also reports he was repeatedly pushed in PE class and in the hallway leading to the boy's locker (Exh. B, p. 58, l. 22-25) and had rocks thrown at him on the way home from school (Exh. B, p. 63, l. 1-2). When he complained to McCormick he was told they couldn't do anything about it because it was off the school area (Exh. B, p. 69, l. 1-8). He also was depressed because Principal Conklin, as well as one of the gym teachers, told K.S. he was

nothing but trouble (Exh. B, p. 36, l. 12-25; Exh. E, p. 850-851 ).

37.     Of course, there is likely no incident that was more traumatic then when K.S. was in a room with Principal Conklin, Vice- Principal McCormick and his Counselor, Ms. Allred.  They brought in Police Officer Quigley and then closed the door on him.  The police officer put his hand on his gun, which particularly frightened K.S. They wouldn't let him move or call his mother. He felt time it was all of them against him (Exh. B, p. 96, l. 1-25).  At one point Conklin told K.S. they were going to put him in handcuffs and carry him out of the building so everyone could see it (Exh. B, p. 116, l. 10-13).6 McCormick admits this was a show of force in an attempt to have K.S. to comply with school rules (Exh. F, p. 197, l. 1-9).

38.     K.S reports he is still going through the depression (Exh. B, p. 21, l. 1-3).  He's still tormented by the experience and it's taken over year to start to feel better.  He still has sleep disturbance when he thinks about his time at this School District (Exh. B, p. 100, l. 1-25) and gets headaches (Exh. B, p. 100, l. 16-22).  His mother reports that K.S. has never fully recovered from the trauma he experienced at the Tidwell School (Exh. D, p. 58, l. 23-25).

39.     With this in mind it should come to no surprise that Vice-Principal McCormick stated that she, and others, saw K.S as "socially crippled" (Exh. F, p. 57, l. 12-13) and a student "at-risk" (Exh. F, p. 58, l. 13-15).  McCormick admits she never tied together the harassment K.S. was experiencing and the problems he experienced when defending himself (Exh. F, p. 191, l. 7-21).

40.     Almost a year after K.S. left the School District a psychological assessment was completed on his behalf.  Not surprisingly it did not show the same level of emotional distress as K.S.

_____

6. In fact, Mrs. Thomas also experienced this same indignity with Officer Quigely.  She rightfully believes these actions were racially motivated (Exh. D, p. 73, l. 11-19) as were the ones where K.S. was threatened with handcuff and to parade him in handcuffs in front of the other students (Exh. D, p. 77, l. 8-15).

had while he was this school district, was getting all A's and B's and was having no disciplinary problems at (Exh. E, p. 840, 847-849).

D.     K.S. WAS HARASSED AND ASSAULTED BASED UPON HIS GENDER

41.    When K.S. entered the Northwest Independent School District school officials he was almost immediately harassed because of his weight and breast size (Exh. A at ¶ 14 ).   If he had been a female he would have had to wear a brassier. This physical attribute was overt, obvious and ever present and became an ongoing and constant object of derision, as was the fact he was overweight (Exh. C  ¶ 5 )(Exh. A  ¶ 7 ).

42.    K.S. made comments about his body almost everyday (K.S. p. 116, l. 17- p. 117, l. 2).

43.    There were thirteen incidents investigated, with twelve occurring on campus and one off campus (MSJ at ¶ 20).

44.    In mid-September, around the 14th and just after school started, Ms. Thomas met with Tara Allred, the School Counselor and reported that K.S. was crying, moody, was having sleep problems and his stomach hurting all the time. He was being called names, was tripped in the hallways, was being teased because of his breasts and was having his food and books moved around in the cafeteria (Exh. D, p. 51, l. 9-25).

45.    In an email to Principal Conklin and Vice Principal McCormick, Allred reported that K.S. was having "multiple problems in the PE locker room, was being called "cruel names" like the blob and jiggle puss (Exh. E, Dep. Exh. 4, p. 000373).7  She followed it up on the next day with another email, this time reporting problems that K.S. was also having on the bus and in the hallway.  One student was calling him "titty boy" (Exh. E, p. 000380) or titty baby

---

7. These exhibit documents have been used a number of times and have a variety of numbers.  Each page does have a **bolded** six digit number in the lower right hand corner.  As such, K.S. will cite to that page number, with this exhibit.

(Exh. E, p. 000545).   Allred spoke with K.S. who confirmed what his mother reported (Exh. E, p. 000381).

46.     On September 24, 2010 K.S., while on a school bus, was an object of racial slurs (Exh. E, p. 000545), that the student said he hated "fat black men" and would knock the black off him (Exh. E, p. 000720).   Six other students also called him names, said he had "man tits" (Exh. E, p. 000545) and touched his breasts (Exh. E, p. 000405).   At the same time another student poked K.S. in the chest and stated that he "had bigger boobies" than she did and another commented on his "man tits" (Exh. E, p. 000720).   Mother was concerned that the school had not treated the incident with enough decisiveness.   She noted that if K.S. had touched a little white girl's breast, he would be in a lot of trouble (Exh. E, p. 000405).

47.     On September 30, 2010 K.S., while in Physical Education ("P.E.") class (gym) he was involved in another incident with e same group of kids who had bothered on the 24th.   This time he attempted to defend himself and got his first suspension (Exh. E, p. 000405)

48.     By the end of the month the District K.S. was already having a problem with excessive absences, missing school on September 3, 7, 9, 10, 14, 15, 17, 27 and in ISS on the 30th (Exh. E, p. 000529).

49.     On October 7, 2010 K.S. saw a student write something "inappropriate."    K.S took it personally and said something, the boy slapped K.S.'s face (Exh. E, p. 000545), he defended himself and received a referral (Exh. E, p. 000418).

50.     Also on the 12th K.S. reported to Allred that two boys were pushing him in P.E. and in the hallway leading to the locker room (Exh. E, p. 000429).

51.     His mother, Neonda Thomas met with the school's principal, Conklin on the 13th.   She reported he was being picked on and he was going to counseling (Exh. C  ¶ 26-27 ).

52.     She also reported that on the 12th some students threw dirt and rocks at K.S. after school (Exh. C ¶ 43 ) but the school refused to investigate claiming it had no jurisdiction to do so (Exh. E, p. 000545).

53.     After the second six weeks of school, K.S. grade in math went from 98 to 51 (Exh. E, p. 000534).

54.     On the 18th a student threw a mushroom at K.S. defended himself (Exh. E, p. 000546).

55.     On or about the 19th, the Northwest Independent School District received a letter from K.S.'s attorney stating that K.S. has continued to be harassed on the school bus, that mother has attempted to engage the staff in solutions but to no avail.  The attorney wrote that the harassment had been consistent and affected K.S.'s ability to function. Last that he and mother would be happy to meet with staff in a problem-solving meeting (Exh. E, p. 000433). No one from the Superintendent's Office, or from anywhere in the school district responded.

56.     On that same day Ms. Thomas filled out a necessary consent from so that then District could procure K.S.'s relevant medical and mental health records (Exh. C ¶ 21 ).

57.     On that very same day K.S. was referred for *In School Suspension* again (Exh. E, p. 000446).

58.     The School District did not contact K.S.'s therapist after this recent incident nor seek any records (Exh. C ¶ 32 ).

59.     On the 29th K.S. was involved in an incident when he told another student he hoped the child's father, who had cancer, died (Exh. E, p. 000545). The School District did not contact K.S.'s therapist after this recent incident or seek any records (Exh. C ¶ 32 ).

60.     By the end of this month the District K.S. was continuing to have a problem with excessive absences, missing school on October 1, 2 and 4th while in ISS, and out on October 8, 12, 13, 18 and back in ISS for the 19, 20 (Exh. E, p. 000530-531).

61.    On November 1, 2010 K.S. was involved in another incident with the same boy  (Exh. E, p. 000546).

62.    On November 9, 2010 K.S. was involved in another incident  (Exh. E, p. 000546).

63.    By the end of this month the District K.S. was absent on November 1, 2 and 9, and was in *Out Of School Suspension* ("OSS") on November 3, 4, 5, 10, 11, 12 (Exh. E, p. 000531-532).

64.    On December 7, 2010 K.S complains he is called "bean-dip" (Exh. E, p. 000546).

65.    On December 15, 2015 K.S. was involved in another incident and assault charges were filed against him and he was placed in the *Disciplinary Alternative Education Program* and in OSS for the 16th (Exh. E, p. 000509; 000546).

66.    When the District investigated the incident, one student reported that "People sometimes make fun of K.S. because of his weight.  I sometimes think that's why he gets into fights. Because when he is in the gym he is always alone" (Exh. E, p. 000516).

67.    On or about Dec. 16th, the District received a letter from the Children's Medical Center, and K.S.'s therapist and physician that noted he had a Major Depressive Disorder, had medications prescribed and increased because of the unchecked harassment he was experiencing at school (Exh. E, p. 000507-508). There is no evidence provided by the District that anyone ever contacted the physician or therapist requested medical information about K.S.  Rather McCormick attacks the letter and attempt to use the wording against K.S and to their own benefit (Exh. E, p. 000547).8

68.    The entire attendance record for the semester from September 1st to mid-December there were 47 days where school was open. Of those 47 days, reducing the time K.S. was absent

---

8.  When McCormick was asked at the Due Process Hearing as to what she meant by this statement, she was evasive ( ).

from school or either left him in ISS, OSS or the DAEP was apparently 17 days (Exh. E, p. 000529-532).   It is reported that during this period there were 13 incidents where K.S. was either a victim of harassment or was disciplined for defending himself (Exh. A  ¶ 24 ).

69.     On January 4, 2011 the school district finally responds, at least in part to K.S' plight, and now requires K.S., when he returns to school after his suicide attempt, to sit behind the bus driver, while coming to and from school (Exh. F, p. 158, l. 16-18).  They finally agree, albeit to late, to provide him a psychological evaluation (Exh. E, p. 000747).

E.     THE HARASSMENT WAS SEVERE AND PERVASIVE

70.     Over the course of the fall semester, K.S. missed fifteen (15) full days of classes, and sixteen (16) partial days of  including in-school ("ISS") and out-of-school suspensions, as well as referrals to the school's Disciplinary Alternative Education Program ("DAEP").

71.     During this period K.S.'s grades suffered. He started doing well in the first six weeks with four A's, a very high B, a low B, and a low C.  His first six weeks average was a 90.4. In the second six weeks, many of his grades dropped.  Band dropped 11 points, Science dropped 15 points, World Cultures dropped 7 points, his Math class stayed at a very low C, and his Math Challenge class dropped 47 points.  His second six weeks average was a 79.9

---

9.  At the Due Process Hearing, the Vice Principal McCormick testified that she didn't believe taunts about weight were related to K.S having large breasts.  She also reported that the Superintendents' Office hadn't sent the first letter from the attorney (Exh H, p. 000238). She admitted that she never sought information from K.S.'s private counselor after any incident (Exh H, p. 000239).  When McCormick read the report of K.S.'s physician she attempted to rip it apart and use it against K.S and in favor of the school district (Exh H, p. 000240-241). When asked about the student who reported that K.S was taunted because of his weight, she didn't think it was evidence of bullying (Exh H, p. 000241).  In regard to the student who stated K.S. was often alone in gym, every teacher questioned reported they did not see him alone (Exh H, p. 000242).  The school's Special Education Director admitted at the hearing admitted that when a student's grades go down from the first six weeks to the second, the staff at the Tidwell Middle School had a duty to inquire as to what the problems were that effected the child's problems with attending school and related decrease in grades.  In response, McCormick testified a 47 point drop from one class to another "wasn't concerning" to her (Exh H, p. 000245).   The gross disparity in the manner in which these various facts are viewed (Exh H, p. 000242,243; (DE#37-12, p. 23/27; App. E at p. 1, 9), create a contested issue of material fact, in this cause.

72.     In addition, K.S. became depressed requiring individual counseling and later became
        suicidal, and made an attempt on his life.  He did also then require inpatient mental health
        services. The harassment was so bad, his depression so severe, that he was forced to leave
        the school and even the area (Exh. C  ¶ 73-75 ).

F.      THE SCHOOL DISTRICT WAS DELIBERATELY INDIFFERENT TO THE
        HARASSMENT K.S. RECEIVED

73.     If the District would have developed a check-list based upon their own training module K.S.
        would have been received a "check" for almost every single indicator, showing that K.S.
        was:

        a.      harassed because of race (Exh. A  ¶ 32 );

        b.      harassed because he had female like breasts (Exh. A  ¶ 7 );

        c.      assaulted because he had female like breasts (Exh. A ¶ 14 );

        d.      harassed and assaulted in all the hot spots, like the playground, lunchroom, halls and
                the bathroom (DE#37-12, p. 13/27) and even outside the school, as well (DE#37-12,
                p. 13/27), ( );

        e.      had report of high absenteeism (Exh. C  ¶ 36 );

        f.      had reports of depression (DE#37-12, p. 16/27), (Exh. C  ¶ 27 );

        g.      had reports of internalizing the depression with physical manifestations like
                headaches, abdominal problems and cuts on the arm (DE#37-12, p. 17/27), (Exh. C
                ¶ 27 );

        h.      seen to fight back when provoked (Exh. C  ¶ 64-66 );

        i.      would even bully weaker and smaller children (DE#37-12, p. 18/27), and

        j.      that unchecked harassment will lead to suicidal ideation and attempts (DE#37-12, p.

21/27), (Exh. C ¶ 27 ),(Exh. A ¶ 25 ).

74.    It is true the District investigated many of the allegations.  It is likewise true the District did punish, at least sometimes, the alleged perpetrators.  Nevertheless, if the District had developed a checklist for itself, or had some ongoing monitoring system as required, it would have seen that punishment (student exclusion), peer mediation and simple short-term solutions (DE#37-12, p. 7, 25-26/27) did not stop the harassment (or incident reports).  In fact, if the District had just listened to Ms. Thomas rather than fought with her, they too would have seen that K.S.'s depression had worsened over time with no progress being made in stopping the harassment.  They also failed to respond to mother's request for more specific information about interventions and services, they were providing K.S. (Exh. D, p. 35, l. 10-12; 17-21; 36, l. 1. 1-7; 11-15).

75.    In fact the School District's *Summary Judgment* evidence is devoid of <u>any</u> required interventions (emphasis added), aside from having an investigation and rendering punishment.  Whether it be those interventions provided in directives by the Office of Civil Rights, or by the Department of Justice, or by the Health Resources Services Administration, or by their own School Board Policies and Procedures, or by the training modules they provided to staff and now by over a decade of caselaw, there is no evidence the District ever considered or let alone provided, any of the following to K.S.; counseling; a psychological assessment; *Social Skills* training; a 1:1 aide; a paraprofessional to monitor "hot spots" and follow perpetrators; or investigate any complaints under Title IX standards; or provide an ongoing analysis as to the effectiveness of any interventions (Geigerman ___ ).

## V. <u>OUT-OF-POCKET EXPENSES</u>

76.    K.S. reports the following out-of-pocket expenditures dating from August 2010 to Present.

    a.       In-patient expenses = $6,000,

    b.       Out-patient expenses = $2,400,

    c.       Tuition/uniforms/books at Evangel Christian Academy (2 yrs) = $14,500**,**

    **d.**       Legal fees and expenses = $17,000, and

    e.       Travel expenses, Dallas to Shreveport twice a month since Jan 2011 = $12,052.58

## VI. <u>ARGUMENT AND AUTHORITIES</u>

A.    ELEMENTS OF A TITLE IX CLAIM

77.    Before K.S. speaks more specifically to the facts in his case, he believes it would be wise to review lead case in this area, <u>Davis v. Monroe County Board Of Education</u>, 526 U.S. 629 (1999), for two purposes.  The first, is to consider the types of facts and quantum of evidence that would lead a reasonable juror to believe a school district was deliberately indifferent to the bullying and harassment a student was experiencing at school.  The second, is to review the legal analysis the Court used, when applying those facts to the operative law.

78.    LaShonda Davis was harassed by a male student (G.F.) from approximately December of 1992 to the middle of May in 1993.  During this period the boy attempted to touch her breasts and genital area.  He also made vulgar statements related to the same occurring twice in January of 1993.  These three incidents were reported to the classroom teacher, who reportedly told LaShonda's mother the school's vice-principal, was aware of the incident and would take action.  The school record reflects none was taken. Apparently G.F. bothered other females and as a group, attempted to speak with the school's principal about the situation, but he refused to do so.  526 U.S. 633. LaShonda's grades

fell and she became depressed and suicidal.10

79.    While not specific, the record does reflect the harassment occurred for many months.

There are specific allegations of two incidents in February, one in gym class and another

in the classroom.  Both were reported.  Here again, the record reflects that no action was

taken.  There was another allegation in early March and again no action was taken.  The

Supreme Court noted that no effort was ever made to separate G.F. and LaShonda, even

when she just wanted to change seats in class.  There was also allegations that the School

Board had not established a policy on the issue and had not instructed staff as to how to

address this type of harassment. 526 U.S. 633-635.

80.    The Supreme Court first addressed the School Board's argument that Title IX did not

extend to student upon student sexual harassment, because there was nothing in the

enabling legislation that would have put them on notice, of such liability.  In rejecting

that contention, they noted that the regulatory scheme promulgated had long provided

School Boards notice that they could be liable for failure to adequately respond to student

upon student harassment. 526 U.S. 641-643; *citing* 34 CFR ¶106.31(b)(6); 106.31(d);

106.37(a)(2); 106.38; 106.51(a)(3)[1998]. This regulatory scheme included guidelines

developed by the Department of Education's *Office of Civil Rights* ("OCR"). 119. S.Ct.

1673 *citing* 62 Fed. Reg. 12034, 12039-12040 [1997]; 59 Fed. Reg. 11448-11449 [1994].

526 U.S. 647-648.

81.    In the discussion about the relevant elements in such a case, it was written that the school

district must have control over the student and perpetrator, 526 U.S. 644 and that the

---

10.  Apparently these few incidents, as well as the effects of the bullying and harassment upon LaShonda's educational experience satisfy this "severe and pervasive" element.

school district's alleged failures make the student more susceptible to ongoing

harassment, 526 U.S. 644.

82.    In regard to whether or not the bullying was severe and pervasive, the Supreme Court

looked at both the acts of the harassment and their effects.  As to the first, the Court

noted a School District would need to look to the constellation of surrounding

circumstances, expectations and relationships between the students, including and

especially if more than one student is harassing the victim.  Moreover, simple teasing and

name-calling had less of concern as compared to physical touching. 526 U.S. 650-651.

As to the second, indicators of a deprivation of educational opportunity is not necessarily

evidenced by physical exclusion, but is linked to a drop in grades, 526 U.S. 652, and

there is systemic effect upon the student. 526 U.S. 653.   In short, a school district is

liable for student-upon-student sexual harassment where their response is clearly

unreasonable (526 U.S. 648), meaning it failed to appropriately respond (526 U.S. 649).

The response includes not only a duty to investigate allegations of student on student

harassments and assaults but an attempt to put an end to both. 526 U.S. 654.

B.    APPLICATION OF THE FACTS

    1.    K.S. Was Harassed And Assaulted Because Of His Gender

83.     It is uncontroverted that K.S. is a student who was victim of student upon student verbal

harassment based upon the fact he had large, female like breasts.

84.    It is uncontroverted that K.S. is a student who was victim of student upon student

physical  harassment based upon the fact he had large, female like breasts.

    2.    The Northwest ISD Was Aware Of The Harassing And Assaultive Behaviors

85.     It is uncontroverted that the Northwest ISD was aware of the allegations that K.S. was a victim of verbal harassment based upon the fact he had large, female like breasts.

86.     It is uncontroverted that the Northwest ISD was aware of the allegations that K.S. was a victim of assault based upon the fact he had large, female like breasts.

     3.     The Harassment Was Severe And Pervasive Causing A Deprivation In The Educational Experience K.S   Received

87.     The School District alleges that NFISD is entitled to summary judgment because the Plaintiff cannot establish that he suffered a systemic or ongoing pattern of harassment based upon gender or gender stereotypes that was so severe, pervasive and objectively offensive,  that it barred him equal access to an educational opportunity or benefit (DE# 37, p. 27/33) *citing* Davis at 633, 652-653.

88.     It is uncontroverted that K.S. was verbally harassed almost every single day while at the Tidwell Middle School (Exh. A  ¶ 7 ).

89.     It is uncontroverted that such verbal harassment included racial epithets like fat black boy (Exh. A  ¶ 15 ).

90.     It is uncontroverted that such verbal harassment included comments with sexual overtones like, "titty boy," teddy titty baby," that he had "bigger boobies" or "bigger titties" than some of the girls.  Further, that in concert with these sexually laced comments he was called the associated terms for a boy who looks like as "gay," and "faggot," (Exh. A  ¶ 15).

91.     It is uncontroverted that K.S. was touched on his breasts by at least three different students (DE# 37, p. 27/33)

92.     K.S. further reports that students would run by and pinch and twist his breasts and

comment on how they would jiggle (Exh. A ¶ 34).  It is controverted that K.S. these

assaults were sexual in nature.

93.    This perception was reinforced by staff in gym class who told K.S. that he looked "like a

girl that shaved their head (Exh. A  ¶ 35).

94.    It is uncontroverted that K.S. was also physically assaulted while at the Tidwell Middle

School (Exh. A  ¶ 14).

95.    It is uncontroverted that the harassments and assaults effected K.S. in a number of ways.

First, he showed a marked decrease in attendance during the period he was at the Tidwell

Middle School (Exh. C  ¶ 36).

96.    In addition, it is uncontroverted that K.S. showed a marked decrease in grades during the

period he was at the Tidwell Middle School (Exh. C  ¶ 36).

97.    Moreover, it is uncontroverted that K.S. experienced depression requiring outpatient

therapy during the period he was at the Tidwell Middle School (Exh. C  ¶ 27 ).

98.    Further, it is uncontroverted that K.S. first experienced *Irritable Bowel Syndrome* during

the period he was at the Tidwell Middle School.

99.    Further, it is uncontroverted that K.S. first experienced headaches during the period he

was at the Tidwell Middle School.

100.    Further, it is uncontroverted that K.S. was placed in *In School Suspension* during the

period he was at the Tidwell Middle School.

101.    Further, it is uncontroverted that K.S. was placed in *Out Of School Suspension* during the

period he was at the Tidwell Middle School.

102.    Further, it is uncontroverted that K.S. received outpatient mental health services for

depression, during the period he was at the Tidwell Middle School.

103.   Further, it is uncontroverted that K.S. received inpatient mental health services for suicidality during the period he was at the Tidwell Middle School.

104.   Further, it is uncontroverted that K.S. changed schools because of the period of time that he was at the Tidwell Middle School.

105.   Further, it is uncontroverted that K.S. moved from the Dallas area because of the period of time that he was at the Tidwell Middle School.

106.   It is uncontroverted that on one occasion K.S. was in a room with the Principal, Vice-Principal, Counselor and a peace officer.  He was not permitted to leave.  He was not permitted to speak with anyone.  The Officer very obviously brandished a gun, all intended to scare K.S. into better behavior.  K.S. was told that if he didn't behave he would be carried out of the school in handcuffs, for everyone to see.  In fact, this fact-pattern not only shows a *hostile educational environment* but borders upon intentional racial discrimination.

107.   A reasonable juror could determine that K.S. has provided significant material evidence that the harassment and assaults (and discrimination) he received was severe and pervasive and likewise effected a deprivation of educational opportunities.  As such, the District's *Motion For Summary Judgment* as to this element must be denied.

   4.   The School District Was Deliberately Indifferent To The Harassments And Assaults K.S. Experienced

108.   The School District alleges that NFISD is entitled to summary judgment because the Plaintiff cannot establish that the District was deliberately indifferent to harassment and assaults he experienced, ng pattern of harassment based upon gender or gender

stereotypes that was so severe, pervasive and objectively offensive,  that it barred him

equal access to an educational opportunity or benefit (DE# 37, p. 28-31/33) *citing* <u>Davis</u>

at 633, 652-653.

109.   In support, the District notes that it has policies and procedures to address the issue at

hand and that it communicated often with the family about mutual concerns.  Further,

and that at least as to the incidents they have a record of, they investigated those

allegations and responded by punishing participants (DE# 37, p. 28-31/33).

110.   In general K.S. does not contest what the District reports, except that not all of his

complaints were investigated.  More importantly, K.S provides significant evidence that

what the District did, or more importantly, did not do, was "effective" or "appropriate" or

" thorough" or "reasonable" (Exh. G-1, p. 12).

111.   As noted above, <u>Davis</u> (at 651-654) asks us to look at the *constellation of facts*.  It

includes, among other things, whether it was one incidents or many; whether the student

was harassed by only one other student, or by many; whether it was mere teasing or more

(physical touching); whether only the student complained or did others as well; how it

affected grades and not only were the allegations investigated, but what effect the

investigation had to end the harassment.  In this case K.S was harassed but more than one

student, often by more than and by more than one student at a time  (Exh. G-1, p. 2-3, 4,

6, 12).

112.   This *constellation* and the items requiring review is also well-described in training

module School District staff received (as noted above).  Again, briefly that includes for

instance, not only the above, but in completing and investigation or in this case, multiple

investigation, whether or not race is also an issue (DE#37-12, p. 9/27). Further, whether the place where the allegations re-occur ("hot-spots") are given special review (DE#37-12, p. 13/27) and are not limited to only in-school incidents (DE#37-12, p. 13/27). Further, the District has a duty to include in their investigation not only the incident, but whether the student reports absenteeism, depression (DE#37-12, p. 16/27) and any physical manifestations of their depression.  Another part of this constellation is that the investigation needs to at the very least address, and even link the victim's defense of himself and/or harassment weaker and smaller children  (DE#37-12, p. 18/27).  All the relevant professional standard of care note that the least effective program is punishment (student exclusion), peer mediation and other simple short-term solutions (DE#37-12, p. 7, 25-26/27).  Further, that even after an investigation is completed, there is an ongoing duty to assess how well or how poorly, the interventions have been effective.  This was not done in this case (Exh. G-1, p. 12)

113.   This *constellation* is also considered by the Department of Justice (p. 7-9), requiring the school to not only investigate claims, or punish participants but to but to provide emotional and psychological support for the victim (Exh. G-1, p. 1-2).  This was reiterated by *Office of Civil Rights* guidelines, as well the *National Center On Secondary And Transition* who OCR contracted with.

114.   This *constellation* and related caselaw, has also adopted various professional standards of care that include the duty to offer the student counseling, a psychological assessment, *Social Skills* training, a 1:1 aide, a paraprofessional to monitor "hot spots," and a complaint system that specially applies Title IX standards as well ongoing analysis as to

the effectiveness of any interventions (Exh. G-1 at p. 8, 10- 11).

115.    In the instant case K.S. was verbally harassed because of race. He was verbally harassed because he had large breasts like a female.  He was physically assaulted because he had large breasts like a female.11  He was harassed not by only one student but many.  In fact, in some instances he was harassed by a group of students, ganging up on him.  He was harassed and and assaulted on many occasions.12  He was specifically told by staff to defend himself and when he did, he got in trouble for doing so.  He even began to displace his feelings on other, weaker students.  He became more depressed over time.  Also over this same period his absenteeism increased but his grades went down, all the above resulting in a suicide attempt. The School District was clearly deliberately indifferent to these indicators, in their investigations (Exh. G-1 at p. 3-4, 6-7, 12).

116.    In the instant case, the School District investigated and or punished, that's all.13  They failed to provide any emotional and psychological support for K.S. including counseling or testing. They failed to provide K.S. *Social Skills* training, a 1:1 aide14 or a

---

11.  Carmichael v. Joshua Indep. Sch. Dist., 2014 U.S. App. LEXIS 11581 (5th Cir., June 19, 2014) [finding harassment based upon failing to conform to gender stereotypes].

12.  In Doe v. Board of Education of Prince George's County, 982 F.Supp.2d 641 (D. Md. 2013) the District Court determined four incidents of inappropriate touching was sufficient to put a school notice of student upon student sexual harassment.

13.   Once as school district is on notice of the unsafe environment, there is a duty to investigate it, including whether previous interventions were successful and adapt to new allegations. *See* Stewart v. Waco Indep. Sch. Dist., 711 F.3d 513 (5th Cir. March 14, 2013), *opinion vacated* at 2013 U.S. App. LEXI. 11102 (June 3, 2013); *see also* M.P. ex rel. K. v. Indep. Sch. Dist. No. 721, 439 F.3d 865, 868 (8th Cir. 2006)

14.  In J.B. v. Mead School District No. 354 2010 WL 5173164, the Court found that not only was the provision of a one-to-one escort as integral to keeping a safe environment but was that assigned a specialized counselor skilled in dealing with student, who had Autism.

paraprofessional to monitor "hot spots."15  They failed to monitor even their limited

interventions. They failed to assure K.S. was not re-victimized.16 (Exh. G-1, p. 11). This

too evidences "deliberate indifference.

117.     In fact, the School District Defendant inflamed the situation when staff stated he looked

like a bald girl, made him do extra pushups after making a complaint, made fun of him

and calling him a mama's boy, for telling his mother punished him for making a

complaint, telling him to stand up for himself and then punishing him for doing exactly

that (Exh. G-1, p. 4).  Such acts appear to be more than just "indifferent" they border on

the intentional.

118.     In Davis the Court considered as an element of indifference the fact more than one

student had complained.  In this case, not only did K.S. complain but so did his mother,

his therapist and physician.  Not once did the District attempt to seek K.S.'s therapy

records until it was "too late."   This too evidences "deliberate indifference."

119.     In T.K. v. New York City Dept. of Educ., No. 10-cv-00752, 2011 U.S. Dist. LEXIS

44682, 2011 WL 1549243 (E.D.N.Y. April 25, 2011) the Judge wrote, in relying upon

Davis where a student is substantially restricted in learning opportunities, and there is an

issue of deliberate indifference, it is "a question for the fact finder."  This Court should

make a similar finding.

_____

15.  In Emily Z. v. Mt. Lebanon Sch. Dist., No. 06-442, 2007 WL 3174027 (W.D. Pa. 2007) [school district can avoid being deemed "deliberately indifferent" by retaining a one-to-one aide, and by providing social skills training on how to actually deal with the harassment].

16.  A systemic review of the responses by the North Forest Independent School District, clearly evidences that in their *Motion For Summary Judgment* they have overestimated their own effectiveness in addressing the issue (DE#37-12, p. 23/27).

120.    As noted in the <u>Davis</u> decision and its progeny, including the many cases cited herein, all

the inferences must inure to the benefit of Plaintiff at this juncture of the proceedings.  As

such, a reasonable juror could determine that K.S. has provided significant material

evidence that the School District was deliberately indifferent to the harassment and

assaults he experienced based upon any and all of the items noted in this section, whether

it be individually or in *constellation* with each other.  For this reason the District's

*Motion For Summary Judgment* as to this element must be denied.

## PRAYER

   **WHEREFORE, PREMISES CONSIDERED**, Plaintiffs the School District's *Motion For*

*Summary Judgment* be DENIED, and for such other relief as this Court in equity, deems just and

proper and for such other relief as the Court may deem just and proper in law or in equity.

Respectfully submitted,


Cirkiel & Associates, P.C.

 /s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
1901 E. Palm Valley Boulevard
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]
Fed. ID No. 21488
State Bar No. 00783829
**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing has been forwarded to the following parties on this 26th day of October, 2015 by Notice of Electronic Filing from the Clerk of the Court:

Mr. Tom Brandt, Attorney
Fanning Harper Martinson Brandt & Kutchin, P.C.
Two Energy Square
4849 Greenville Ave.
Suite 1300
Dallas, Texas 75206
(972) 860-0338 [Telephone]
(214) 987-9649 [Facsimile]
tbrandt@fhmbk.com [Email]
**ATTORNEYS FOR DEFENDANT**
**NORTHWEST ISD**


 */s/ Martin J. Cirkiel*
Martin J. Cirkiel